# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KIYANA MILLER,
Individually and as a representative of all
others similarly situated,

*Plaintiff,*

v.

MCGRAW-HILL  LLC; PEARSON
EDUCATION, INC.; CENGAGE
LEARNING, INC.; BARNES & NOBLE
EDUCATION, INC.; BARNES & NOBLE
COLLEGE BOOKSELLERS, LLC;
FOLLETT HIGHER EDUCATION GROUP,
INC.; and EDUCATIONAL PUBLISHERS
ENFORCEMENT GROUP,

*Defendants.*

Case No. 3:20-cv-7281

CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

546853.7

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................... 3

III.   PARTIES ............................................................................................................ 4

     A.     Plaintiff ................................................................................................... 4

     B.     Defendants .............................................................................................. 4

         1.     Publishers ................................................................................... 4

             a)     Cengage ........................................................................... 4

             b)     McGraw-Hill .................................................................. 4

             c)     Pearson ........................................................................... 5

         2.     Retailer Defendants .................................................................... 5

             a)     Barnes & Noble .............................................................. 5

             b)     Follett ............................................................................. 6

         3.     Trade Association - EPEG ......................................................... 6

IV.   AGENTS AND CO-CONSPIRATORS ............................................................. 6

V.    FACTUAL ALLEGATIONS ............................................................................. 8

     A.     Market History and Overview of Students' Multiple Purchasing Options ............ 8

     B.     Inclusive Access .................................................................................. 12

     C.     EPEG and Inclusive Access. ............................................................... 14

     D.     Defendants' Anticompetitive Agreements and Conduct ...................... 15

         1.     Anticompetitive Agreements ................................................... 17

             a)     Exclusive Dealing Arrangements. ................................ 17

             b)     Lease Operator Agreements: Agreements between the Retailer Defendants and the Universities. ..................... 18

             c)     Agreements between Publishers and Universities. ....... 19

d)    License Agreements: Agreements between Publishers and the Retailer Defendants/Universities. ............................................ 20

e)    Master Exclusivity Agreements: Agreements between Publishers and Retailer Defendants. ................................................ 20

2.    Exclusion of Potential Competitors' Access. ............................................ 21

3.    Increased Prices for Course Materials. ....................................... 23

E.    No Legitimate, Pro-Competitive Justifications. ................................................... 24

1.    Affordability. .............................................................................. 24

2.    Consumer Preference. ................................................................. 27

3.    Learning Outcomes. .................................................................... 27

F.    Continuing Violations and Fraudulent Concealment. ........................................... 28

G.    The Industry is Conducive to the Conspiracy .................................................... 29

1.    Market Entry Barriers ................................................................. 29

2.    Opportunities to Meet & Conspire ............................................... 32

3.    A History of Anticompetitive Conduct and Recent Investigation. ............ 34

VI.    RELEVANT MARKET ...................................................................................... 35

VII.    CLASS ACTION ALLEGATIONS .................................................................. 38

VIII.    TRADE AND COMMERCE ............................................................................ 42

IX.    ANTITRUST INJURY .................................................................................... 42

X.    CLAIMS FOR RELIEF ................................................................................... 44

XI.    REQUEST FOR RELIEF ................................................................................ 53

XII.    JURY TRIAL DEMANDED ........................................................................... 55

## I.    NATURE OF THE ACTION

1.    Reading, writing, and listening to professors have long been parts of a post-secondary education. Students at colleges and universities[1] have traditionally started each quarter or semester by reviewing syllabuses for their courses and acquiring their books to read. Plaintiff brings this action on behalf of a similarly situated Class against the largest and most prominent publishers of higher education course materials and their co-conspirators, major on-campus retailers of course materials. Through their joint promotion and implementation of an electronic platform for textbooks and other course materials, called "Inclusive Access," the Defendants have monopolized and restrained trade in the Inclusive Access Market in violation of federal antitrust law.

2.    Inclusive Access is Defendants' anticompetitive system that requires students to pay for and access "Electronic Course Materials"[2] in an exclusively electronic format and only from the Defendants, namely the publishers themselves or the University's official on-campus bookstore. Because students are not able to purchase their course materials elsewhere, Defendants are free of competition and have complete power over course material supply and price.

3.    Through their joint promotion and implementation of Inclusive Access, Defendants have transformed a market where students purchase course materials from a number of outlets into one where students can no longer obtain course materials from any source other than the Defendants. Defendants use Inclusive Access to preclude students from purchasing new or used

---

[1] Hereinafter referred to as "Universities" for efficiency.

[2] An "Inclusive Access textbook" means a post-secondary level textbook in any format for which one of the Publishers offers an Inclusive Access version ("Electronic Course Materials"). "Inclusive Access textbooks" include Electronic Course Materials as well as printed new or used textbooks, e-books and similar formats.
"Electronic Course Materials" means an online version of an Inclusive Access textbook that is offered by one of the Publishers named as a defendant in this complaint.

print textbooks, electronic textbooks or other course materials from off-campus retailers or online sellers, from price-shopping, and from reselling their course materials.

4.      Further, through Defendants' anticompetitive scheme, students are automatically billed for Inclusive Access with virtually no opportunity to opt-out of the purchase. When students do attempt to opt-out of Inclusive Access, it is at the risk of not being able to locate comparable substitute course materials needed to succeed in class. The Defendants have even used this risk to convince students that they may not pass their classes if they opt-out of Inclusive Access.

5.      Defendants collectively promoted and implemented Inclusive Access for the specific purpose of destroying competition, limiting supply, and controlling and raising prices for course materials, all at the expense of students who perennially struggle to pay for tuition, room and board, and course materials – even when competition existed in the market. Defendants did this by colluding to destroy the secondary market that has long served students by providing competitive pricing options for course materials. Defendants effectuated their scheme through agreements with each other that make Inclusive Access only available through the Defendants.

6.      Defendants were able to implement their conspiracy through their market dominance and ability to easily meet and collude through trade associations, industry events, and through their joint promotion of Inclusive Access to Universities. Rather than competing and taking market share from one another, Defendants worked toward a common goal of monopolizing the market, which has allowed them to charge students higher prices for course materials with no procompetitive justifications for their collusive conduct.

7.      Defendants' conspiracy has suppressed competition, reduced student-consumer choice, and raised prices for course materials, resulting in antitrust injury to Plaintiff and the proposed Class in the form of overcharge damages.

8.     Plaintiff brings this action alleging claims under federal antitrust laws and seeks treble damages and injunctive relief.

## II.      JURISDICTION AND VENUE

9.     Plaintiff brings claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. The Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 15; and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws. The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Defendants reside, transact business or are found within this District, and a substantial part of the events giving rise to the claims arose in this District. Defendant Pearson Education, Inc., has headquarters in Upper Saddle River, New Jersey. Both Barnes & Noble College Booksellers, LLC and its parent, Barnes & Noble Education, Inc., have headquarters in Basking Ridge, New Jersey. One of McGraw-Hill's principal properties is an office building in East Windsor, New Jersey.

11.     The Court has personal jurisdiction over Defendants since each has purposefully availed itself of the benefits of this forum and committed wrongful acts in whole or in part within this District, resulting in direct effects in this District.

### III.    PARTIES

#### A.    <u>Plaintiff</u>

12.    Plaintiff Kiyana Miller ("Plaintiff Miller") is a resident of Minnesota and a citizen of the United States. During the Class Period and while residing in Minnesota, Plaintiff Miller purchased Electronic Course Materials for her own use and not for resale that were produced by one or more Defendants or their co-conspirators. Plaintiff Miller purchased the Electronic Course Materials directly from one or more of the Defendants or their co-conspirators. Plaintiff Miller suffered injury as a result of Defendants' conduct alleged herein.

#### B.    <u>Defendants</u>

##### 1.    <u>Publishers</u>

###### a)    *Cengage*

13.    Defendant Cengage Learning, Inc. ("Cengage") is a Delaware corporation headquartered in Boston, Massachusetts.

14.    During the Class Period, Cengage was a Publisher that participated in the Inclusive Access Market and sold Inclusive Access in the United States. During the Class Period, Cengage sold Electronic Course Materials and Inclusive Access directly or through its wholly owned or controlled affiliates to purchasers in the United States.

15.    During the Class Period, Cengage was a member of the Educational Publishers Enforcement Group ("EPEG").

###### b)    *McGraw-Hill*

16.    Defendant McGraw-Hill LLC ("McGraw-Hill") is a Delaware limited liability company headquartered in New York, New York.

17.    During the Class Period, McGraw-Hill was a Publisher that participated in the Inclusive Access Market and sold Inclusive Access in the United States. During the Class Period,

McGraw-Hill sold Electronic Course Materials and Inclusive Access directly or through its wholly owned or controlled affiliates to purchasers in the United States.

18.    During the Class Period, McGraw-Hill was a member of EPEG.

c)    *Pearson*

19.    Defendant Pearson Education, Inc. ("Pearson") is a Delaware corporation headquartered in Upper Saddle River, New Jersey.

20.    During the Class Period, Pearson was a Publisher that participated in the Inclusive Access Market and sold Inclusive Access in the United States. During the Class Period, Pearson sold Electronic Course Materials and Inclusive Access directly or through its wholly owned or controlled affiliates to purchasers in the United States.

21.    During the Class Period, Person was a member of EPEG.

22.    Collectively, Cengage, McGraw-Hill, and Pearson are the "Publishers."

2.    Retailer Defendants

a)    *Barnes & Noble*

23.    Defendant Barnes & Noble College Booksellers, LLC, is a Delaware limited liability company headquartered in Basking Ridge, New Jersey.

24.    Barnes & Noble Education, Inc., is the parent company of Barnes & Noble College Booksellers, LLC, and is a Delaware corporation headquartered in Basking Ridge, New Jersey.

25.    Collectively, Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc., are referred to herein as "Barnes & Noble." During the Class Period, Barnes & Noble sold Electronic Course Materials and Inclusive Access directly or through its wholly owned or controlled affiliates to purchasers in the United States.

b)  *Follett*

26.    Defendant Follett Higher Education Group, Inc., ("Follett") is an Illinois corporation headquartered in Westchester, Illinois.

27.    During the Class Period, Follett or its predecessors, subsidiaries, divisions or other affiliates participated in the Inclusive Access Market and sold Inclusive Access in the United States. Follett sold Electronic Course Materials and Inclusive Access directly or through its wholly owned or controlled affiliates to purchasers in the United States.

28.    Barnes & Noble and Follett, collectively, are the "Retailer Defendants."

3.    <u>Trade Association - EPEG</u>

29.    Defendant Educational Publishers Enforcement Group (EPEG) is a consortium of the Publishers and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through any of its members, the Publishers.

30.    During the Class Period, the Publishers formed EPEG, which has provided the Publishers with the opportunity and means to conspire, and encouraged them to do so. EPEG has developed, adopted, and implemented so-called Anti-Counterfeit Best Practices (the "EPEG Guidelines"). EPEG claims it intends the Guidelines to eliminate counterfeit textbooks in the market, but they include pretextual standards that allow Publishers to control who can buy and sell College Textbooks and further the conspiracy's goals to raise prices of Electronic Course Materials, reduce supply and access, and limit consumer choice. The Publishers in combination (1) coerce retailers to adopt and follow the EPEG Guidelines and (2) enforce the EPEG Guidelines.

**IV.    AGENTS AND CO-CONSPIRATORS**

31.    "Defendant" or "Defendants" as used in this complaint includes all Defendants named specifically above, as well as all of the named Defendants' predecessors, direct or indirect

parents, subsidiaries or divisions, including entities that played a material role in the unlawful acts alleged in this lawsuit and merged with or were acquired by the named Defendants.

32.     Whenever this complaint refers to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, employees, or agents while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

33.     Defendants' corporate families in this case acted as single enterprises with the parent corporations exercising substantial control over their subsidiaries.

34.     The high-ranking managers who committed the anticompetitive misconduct in this case acted for Defendants' top-level legal entities and bound the entire corporate family.

35.     Various other persons, firms, and corporations, that are unknown and not named as Defendants have performed acts or made statements in furtherance of the conspiracies. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not this complaint names the co-conspirators as defendants. "Co-conspirators," as used herein, include direct or indirect parents, subsidiaries, and divisions of all co-conspirator entities.

36.     Individual participants in the conspiratorial discussions did not always know the precise corporate or subsidiary affiliations of their counterparts, nor did they distinguish between the entities within a corporate family. When representatives of these companies met and made collusive agreements and manipulated prices, they did so on behalf of their entire corporate family. The representatives did not distinguish between corporate subsidiaries. Defendants knew the individuals in the meetings, telephone, email, or chat room conversations represented their entire respective corporate family; otherwise, the conspiracy would not have functioned properly with

less than agreement from the entire family, and Defendants would not have entered such agreements.

37.    Each Defendant acted as the principal, agent, or joint venture partner of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## V.    FACTUAL ALLEGATIONS

38.    Plaintiff incorporates by reference, as if fully set forth herein, the previous allegations contained in this complaint. Plaintiff further alleges the following.

### A.    <u>Market History and Overview of Students' Multiple Purchasing Options</u>

39.    Historically, students bought new or used printed textbooks from campus bookstores or off-campus bookstores, or bought used textbooks from friends or other students. As e-textbooks developed, students could buy them from online sources, including Amazon and Chegg. To buy "course materials," they purchase access codes (or unique serial numbers) that they use to unlock the digital textbooks, or course materials.

40.    Course materials for University and other higher education courses include printed textbooks as well as digital course materials, which serve as alternatives to traditional, printed textbooks. Digital course materials may also include additional materials for students' course work such as assignments, exams, or other software. The market size for digital course materials in U.S. higher education is estimated at approximately $2.1 billion as of 2018.

41.    A secondary market for textbooks and other course materials still exists. Through the secondary market, students who purchased print course materials have the opportunity to resell those materials after purchase, thus recouping a portion of their costs. The used textbooks are in turn resold by retailers to other students at significantly reduced prices.

42.    The Publishers produce course materials and are competitors or potential competitors of one another. Industrial concentration among such Publishers has increased over the years. Historically, there were numerous university textbook publishers, but consolidation beginning in the 1990s gave the largest five publishers somewhat over 80% of industry sales. More recently, the three largest course materials publishers in the United States, collectively, the Publishers, control 80% to 90% of the course materials sales.[3]

43.    In May 2019, Cengage and McGraw-Hill announced a planned all-stock merger that would have further concentrated the industry. The proposed merger would have combined the second and third-largest publishers of course materials into an entity with approximately 45 percent market share.[4] Defendant Pearson controls approximately 40 percent of the course materials market. The proposed merger, which would have created an effective duopoly, was highly contested by public interest groups, student groups, and student governments. A letter from six U.S. Senators to the Department of Justice expressed concern over the merger in view of rising textbook costs, noting "the highly consolidated nature of the textbook industry," which is "overwhelmingly dominated by a small number of companies." Eventually, under pressure from the Department of Justice and the U.K.'s competition authority, the parties abandoned their merger.

44.    The Publishers traditionally made available and sold course materials to the Retailer Defendants and other retailers. The Retailer Defendants often contract with Universities for a

---

[3] Pearson reports that its higher education market share is approximately 40% over the last five years. Cengage is the second largest college textbook publisher with approximately 24% of the higher education market. McGraw-Hill is the third-largest college textbook publisher with approximately 21% of the higher education market.

[4] Industry and student groups, and others, filed multiple objections to the proposed merger. The Department of Justice sent a second request for information, signaling its further investigation.

campus bookstore that sells and rents course materials. Independent retailers, including both online sellers and brick-and-mortar stores, compete with the Retailer Defendants to sell and rent textbooks and course materials to University students.

45.    Universities that outplace their campus stores instead of running them internally hire a collegiate retailer, which generally pays the school for the right to operate the campus store. The Retailer Defendants operate approximately 57% of the lease-operated college bookstores nationwide, sometimes competing to operate each school's campus store.

46.    Historically, various retailers engaged in full and open competition for student purchases of higher education course materials. Schools and faculty members selected course materials; publishers made such course materials available to *all* retailers at the same price, and students searched for competitive pricing and terms for the course materials, buying them from off-campus stores, other students, Retailer Defendants, or local or online resellers. Especially after the introduction of online selling—of which certain Non-Defendant Retailers[5] were at the forefront—the course materials market offered many retailer choices for students (e.g., Non-Defendant Retailers, the Retailer Defendants, Amazon, Chegg, and others) and those retailers competed on price. Competition among those retail sources served as a check on Defendants' and others' prices.

47.    The Retailer Defendants are the largest retailers in the course materials market. They currently control an estimated 57% of the lease-operated collegiate retailers at Universities and serve an estimated 64% of overall University-enrolled students. The Retailer Defendants typically pay a lease for the right to serve as the University's bookstore. The Retailer Defendants,

---

[5] "Non-Defendant Retailer" means a business, other than the Retailer Defendants, that seeks to sell new or used print or electronic college-level textbooks at retail.

in recent years, have significantly increased the amount they will pay to become the lease-operated retailer at a University. In fact, the Retailer Defendants now often pay millions of dollars to obtain even one "on campus" location. The Retailer Defendants often can access the Universities' computer systems and are able to take federal financial aid and payment directly from students' accounts for purchases of course materials.

48.     For several decades, the publishing world has used an assigned "International Standard Book Number" ("ISBN") to track a particular book title. Publishers purchase ISBNs and assign a new ISBN to each edition of a given publication. Students' reliance on ISBN numbers became more common with the increased purchase and resale of course materials online. Especially beginning in the early 2000s, ISBN numbers assisted students in locating course materials at the most competitive prices.

49.     Before Defendants' conspiracy, described herein, student spending on Defendants' textbooks had declined as students gained access to alternatives to purchasing new print or electronic textbooks from campus stores. These alternatives included traditional used print textbooks and off-campus stores, along with the new online booksellers.

50.     From 1997 to 2007, University bookstores reportedly sold used books at an average of just under 75% of the new textbook price due to contract constraints forbidding used book prices to exceed 75% of the new book prices.

51.     The advent of online sales increased choices for students and broke down barriers to competition. Retailers included the Retailer Defendants, large online retailers (e.g., Amazon, Chegg, and others), small online retailers, and small brick-and-mortar retailers. Students located and compared prices for new and used textbooks and other course materials using ISBNs. The

end-result was devastating to the Publishers who suffered from decreased sales and revenues, strong incentives to fight the developing competition.

52.    Following these incentives, the Publishers sought ways to reduce competition and increase their sales. Among other efforts, the Publishers began to market customized packaging or customized delivery of "custom books," selling the same book with minimal alterations as purportedly new products. The Publishers obtained unique ISBNs for these books, created "one time" access codes, and added sales terms forbidding resale. The purpose of these products was to hinder students from obtaining used or second-hand books.

53.    Initially, independent bookstores could still obtain access to the same "custom book" materials from the Publishers at the same cost as other retailers. They could still compete with better prices, sales terms, or rental selections, maintaining other shopping options for students.

**B.    <u>Inclusive Access</u>**

54.    Defendants' anticompetitive conduct focuses on their course material offering, ironically called "Inclusive Access." The Publishers—together and in coordination with the Retailer Defendants—now market course materials as "Inclusive Access" that can only be provided to students in "new" condition. Further, students must now purchase the Publishers' "Electronic Course Materials" (meaning Defendants' online, digital version of the textbook) every semester with only limited-use privileges. Much more often now, students can only obtain these Electronic Course Materials through Inclusive Access directly from the Publishers or directly from an "on campus" bookstore, which often is operated by a Retailer Defendant.

55.    The Publishers have collectively and deliberately pushed their "Inclusive Access" products (sometimes called "Direct Access" or "Direct Bill" products, among other monikers). Defendants developed Inclusive Access through the Publishers' joint pilot programs for Electronic Course Materials at Universities. Each semester, the Publishers have collectively increased the

number of Universities and classes affected by Inclusive Access. The Publishers' end goal is to move all Universities and classes to 100% Inclusive Access materials.

56.    For Inclusive Access, there is no choice of format or delivery method. Instead, as a result of the Publishers' concerted actions, the delivery method and format are purposefully and artificially restricted as follows. Through Inclusive Access, students are provided with time-limited access (typically a single semester) to the Publishers' online materials, which can be "turned on" for the student's account, often directly by the Retailer Defendants. Under Inclusive Access, any student enrolled in a participating class is required, usually through a so-called "course fee" automatically added to the student's tuition bill, to pay for Electronic Course Materials from a specific Publisher and often through the Defendant Retailer for that University. Inclusive Access is offered through no other outlet. Inclusive Access sometimes provides students with a software component that the students should have been able to receive from the University or its faculty (such as homework or lab assignments) without involvement of the Publishers or Retailer Defendants. The Publishers have admitted that the content offered through Inclusive Access is the same content that could otherwise be in other formats. Thus, with Inclusive Access, students are receiving the same course materials content as before but have had (or will have) their costs increased and their choices eliminated.

57.    Further, through Inclusive Access, Publishers and the Retailer Defendants have collectively instituted measures intended and threatening to make students completely captive consumers.

58.    Defendants have developed and pushed agreements with the Universities that make Inclusive Access the default option for course materials. Once a student is registered for a course, the University's bursar office sets the Inclusive Access charges on the student's University account

along with tuition and other charges. The charges are designed to be applied to their student loans, increasing their student debt.

59.    Defendants have developed this accounting and billing system to prevent students from "opting out" of the direct and automatic charges for Inclusive Access course materials such that students necessarily must purchase the Inclusive Access course materials and, thus, do not have the opportunity to purchase substitute products. Although Defendants contend students can "opt-out" of Inclusive Access, as a practical matter, there is usually either no way or no meaningful way to opt-out of Inclusive Access. Upon enrollment in a class that is subject to Inclusive Access, students are automatically subscribed to Inclusive Access and charged for those course materials.

      **C.**    **EPEG and Inclusive Access.**

60.    The Publishers formed Educational Publishers Enforcement Group (EPEG) to combat textbook counterfeiting. Nevertheless, their EPEG Guidelines serve to control who buys and sells course materials, limit supply, exclude potential competition, and charge higher prices.

61.     EPEG created a "white list" of in-group retailers, and encouraged its members to refuse to sell to any businesses not on the white list, which reduced competition from off-campus and online sellers, despite the fact that the vast majority of those sellers simply sold used textbooks and were not engaged in counterfeiting. Applying the "white list" effectively created a "black list" of everyone who was not on the white list.

62.    EPEG also facilitated the Publishers' communication among themselves to implement a new program they called "Inclusive Access" and enforce its terms. The Publishers created their "Inclusive Access" program to exclude the above-described competition and raise prices.

63.    Defendants' Inclusive Access scheme has allowed them to preserve and increase their profits by monopolizing the market for Inclusive Access, to exclude competition, and to

charge supracompetitive prices for college course materials. EPEG assists them in communicating with each other in order to collude on imposing Inclusive Access, as well as imposing pretextual and exclusionary anti-counterfeiting policies. All three Publishers have been members of EPEG since its inception.

### D.    Defendants' Anticompetitive Agreements and Conduct

64.    The Defendants entered into conspiracies and contracts in restraint of trade and abused their collective market power for the purpose of forcing the entire course materials market into their single Inclusive Access product. The end result of Defendants' conspiracy is limited supply and supra-competitive prices for course materials.

65.    By agreeing to move toward only selling Inclusive Access course materials, the Publishers collectively eliminated competition and used their market power to monopolize the relevant market(s). Then, they agreed to only sell Inclusive Access Electronic Course Materials to the Retailer Defendants and to refuse to sell them to Non-Defendant Retailers. They also prevented Non-Defendant Retailers from obtaining Inclusive Access Electronic Course Materials by other means.

66.    Through this scheme, Defendants worked together to increase their own profits at the expense of competition and consumers. The Publishers have conceded that their intent is to shift the entire market to Inclusive Access. On a May 1, 2019 joint investor call regarding the merger of Defendants Cengage and McGraw-Hill, Dr. Nana Banerjee, President and CEO of Defendant McGraw-Hill, described the merger of the two competitors and plans to "[take] out this used secondary market book enterprise that has really been a disruptor for us."

67.    The Defendants' anticompetitive actions have created the ultimate captive market where all students must buy all new Electronic Course Materials from the Publishers through the Retailer Defendants (or the Universities, when a Retailer Defendant was not present). All of this

conduct was knowing and intentional. The Defendants have already achieved many of their goals: they have harmed competition in the markets at Universities across the country and have raised textbook and course material prices for student consumers. The Defendants will continue to raise prices and reduce quality, service, and innovation.

68.     The Publishers did not independently arrive at this decision to create a standardized and "new" Inclusive Access product across the market. Through coordination, Publishers employed the same mechanics to push Inclusive Access onto the Universities. Senior executives of the Defendants frequently and privately communicated with one another in furtherance of the conspiracy. Their conversations included the joint mechanics of the Inclusive Access scheme, such as focusing on the classes that have the highest student enrollment and therefore the largest economic impact on the Publishers. They also discussed furtherance of their joint goal to eliminate the secondary market, monopolize the relevant markets, and boycott the Non-Defendant Retailers.

69.     The Publishers realized that including the Retailer Defendants in their plan would hasten Inclusive Access's Electronic Course Materials' domination of the course materials market. The Publishers used agreements with the Retailer Defendants and the Universities regarding the operation of campus retail locations to promote an exclusive relationship and make Inclusive Access effectively the only game in town. Through these agreements, the Publishers agreed not to sell the Electronic Course Materials to Non-Defendant Retailers. As a result, the Retailer Defendants received the sales from students for those classes every semester, and shared those profits with the Publishers from those Universities.

70.     To further the conspiracy, the Retailer Defendants provided the Publishers with their full cooperation and participation in the conspiracy, including pushing Inclusive Access at the Universities. Prior to Inclusive Access, the Retailer Defendants had an average capture rate of

35-40% of the student purchases of course materials at a University. Their new arrangement effectively eliminated all substitute sources for the Inclusive Access course materials and any potential competition on price. Through the Retailer Defendants' agreement to join the Publishers in their scheme to move the market to Inclusive Access, they secured themselves a position as the exclusive retail providers of Electronic Course Materials, virtually free of competition.

      1.    <u>Anticompetitive Agreements</u>

      a)    *Exclusive Dealing Arrangements.*

71.    Defendants' Inclusive Access scheme is accomplished through a series of exclusive dealing arrangements between the Publishers on the one hand and between the Publishers and the Retailer Defendants (and/or Universities) on the other. These arrangements are either identical or strikingly similar among the Publishers and the Retailer Defendants involved.

      i.    Agreements Among The Publishers:

72.    The Publishers entered into one or more horizontal agreements with each other to: (1) monopolize the relevant market(s) and (2) conduct a group boycott of and concerted refusal to deal with the Non-Defendant Retailers.

      ii.    Agreements Between the Publishers and Retailer Defendants.

73.    The Publishers also conspired with the Retailer Defendants and entered into one or more vertical agreements to (1) monopolize the relevant market(s) and (2) conduct a group boycott of and concerted refusal to deal with the Non-Defendant Retailers to eliminate retail competition. The Publishers then contractually deliver Inclusive Access only through the Retailer Defendants (or, if not lease-operated, the University's own on-campus store) by using either (a) a combination of exclusive dealing arrangements between the Retailer Defendants and the Universities and so-called license agreements (that operate as exclusive dealing arrangements)

between the Publishers, the Universities, and the Retailer Defendants; or (b) a combination of exclusive dealing arrangements between the Retailer Defendants and the Universities, and, upon information and belief, master exclusivity agreements between the Retailer Defendants and the Publishers.

        b)    *Lease Operator Agreements: Agreements between the Retailer Defendants and the Universities.*

74.    Forming a basis of the agreements between the Publishers and Retailer Defendants are underlying lease operator agreements between the Retailer Defendants and the Universities. These agreements typically included exclusivity provisions that granted the Retailer Defendants the right to operate as the exclusive and "official" University bookstore. For example, a typical exclusivity provision in an agreement between a University and a Retailer Defendant stated: "The Bookstore shall be [the University's] exclusive on campus buyer and seller of all required, recommended or suggested course materials and supplies. . . ." At that time, it did not prevent the Publishers from selling to other retailers, and it did not prevent students from making purchases from other retailers. It did not affect who could purchase or sell materials or where they could be purchased or sold.

75.    The situation has now changed. Currently, and in furtherance of the conspiracy, the Retailer Defendants have significantly increased their incentives to the Universities to ensure that the Retailer Defendants become or remain the lease-operator of the University's bookstore. For example, the Retailer Defendants now pay even million dollar sums to Universities to secure their status as lease-operator. The agreements frequently last five years, but they can last 15 years.[6] These high payments have increased over the course of the conspiracy, and are now far beyond

---

[6] Over 90% of the campus bookstore contracts are renewed, extending their average duration.

what would be justified by the Retailer Defendants' profitability prior to the conspiracy. These Defendant-run campus bookstores also return a percentage of their sales to the University. According to documents obtained through FOIA requests, on sales of most products, the Retailer Defendants are providing the University payments ranging from 9.5 to 14% of gross sales. Interestingly, the Retailer Defendants provide the University with lower return percentages—in many instances, only 5-8% of gross sales—on Electronic Course Materials.

76.     All of these actions are seemingly against the Retailer Defendants' self-interest but for the fact that they are an investment in the outcome of the Defendants' conspiracy. The Retailer Defendants' increased up-front payments to the Universities make economic sense only if the Retailer Defendants know that the University will be forced to use Inclusive Access and that the students will be forced to purchase Inclusive Access materials from the Retailer Defendants, thereby significantly increasing the Retailer Defendants' gross profit. Retailer Defendants' payments of lower return percentages on Electronic Course Materials also indicate that Retailer Defendants are capitalizing on the fact that the Universities will increasingly only be able to supply Inclusive Access.

c)     *Agreements between Publishers and Universities.*

77.     The Publishers also agreed upon a plan whereby they would enter into agreements with the Universities to serve the largest classes with the highest student enrollments and; therefore, the greatest economic impact. The purpose of the Inclusive Access scheme is ultimately to convert every class at every University to Inclusive Access. To that end, the Publishers also agreed among each other to use agreements with Universities that required guarantees of classes and/or student numbers and an increase in those numbers over time. For example, a contract between Cengage and Central Washington University gave Cengage the right to terminate its

Inclusive Access program if the university failed "to achieve purchases for at least eighty-five percent (85%) of the students enrolled" in relevant courses.

78.     And a multi-year agreement between Pearson and the University of Florida set "minimum usage rates" of 10,400 enrollments in 2017, which jumped to 47,000 in 2018. Failure to achieve those rates could have led to price increases on course materials.

> d)     *License Agreements: Agreements between Publishers and the Retailer Defendants/Universities.*

79.     The Publishers all entered into agreements with the Universities and the Retailer Defendants to "license" Inclusive Access on an exclusive basis to the Retailer Defendants to sell to students at the University (the "License Agreements"). The Publishers' Exclusive Dealing Agreements have similar, and in some instances, the same language, as well as the same terms and conditions. For example, the License Agreements would provide that:

> Without in any way limiting or amending the terms of the agreements by and between [the Defendant Retailer] and [University], Publisher shall work only with [the Defendant Retailer] to provide [University] the Licensed Program and Licensed Program Materials.

> e)     *Master Exclusivity Agreements: Agreements between Publishers and Retailer Defendants.*

80.     Upon information and belief, the Publishers also entered into master exclusivity agreements (the "Master Exclusivity Agreements") with the Retailer Defendants regarding the sale of Inclusive Access course materials. These Master Exclusivity Agreements eliminated any chance of competition from Non-Defendant Retailers and eliminated the need for the Publishers to enter into the License Agreements with the Universities to accomplish the exclusivity. These Master Exclusivity Agreements, by their very terms, created a confined marketplace, free of competition.

81.     These exclusive dealing agreements, entered into and effectuated by the Publishers and Retailer Defendants, have served to compel Universities and students to deal with the

Defendants on an exclusive or nearly exclusive basis for the provision of Inclusive Access course materials and/or course materials.

82.    The Defendants' exclusive dealing arrangements foreclose 100% of the Electronic Course Materials market from Non-Defendant Retailers. They also foreclose a substantial portion of the College Textbooks market from Non-Defendant Retailers because the Publishers control approximately 90% of the College Textbooks market, and the Retailer Defendants control approximately 60% of the lease-operated University retail stores. As discussed above, Defendants exclude alternative distribution channels and meaningful substitute products.

2.    Exclusion of Potential Competitors' Access.

83.    Examples of instances where the Publishers have refused to sell Inclusive Access to Non-Defendant Retailers include instances at the University of New Mexico, Eastern Kentucky University, New Mexico State University, Dona Ana Community College, and the University of Texas Arlington, and the University of North Texas in 2019. There have been examples of Non-Defendant Retailers approaching each of the Publishers asking why the Publishers would not sell Electronic Course Materials to them. Each of the Publishers responded with the same pre-textual explanations: that they had exclusivity requirements with the Retailer Defendants (or school-operated campus stores) or that their Electronic Course Materials could not exist in a format available for sale to Non-Defendant Retailers.

84.    As an example, when certain Non-Defendant Retailers attempted to purchase Electronic Course Materials from Defendant McGraw-Hill, the order was cancelled, and Defendant McGraw-Hill informed them that "this is an inclusive access item and there are strict contracts to follow. Follett is the only vendor authorized to purchase these types of items for this school." In addition, when the Non-Defendant Retailers attempted to purchase Electronic Course Materials from Defendant Pearson, the order was also cancelled, and the Non-Defendant Retailers

were notified that there was a "contractual agreement exclusively with Barnes & Noble for the course fee materials."

85.    The Publishers have also refused to sell the same course materials to Non-Defendant Retailers at the same price as the Retailer Defendants. For example, one Non-Defendant Retailer, Campus Book Company, Inc., operated a retail location at the University of Texas at Arlington that competed with Defendant Follett's retail location. For courses at the University, Defendant Pearson first refused to sell any Electronic Course Materials to Campus Book Company, Inc., giving a pre-textual explanation that "the University" required exclusivity, which prevented Defendant Pearson from providing Inclusive Access course materials through any retailer other than Defendant Follett. The University denied requiring any such exclusivity, and eventually Pearson allowed Campus Book Company, Inc. to sell Electronic Course Materials to students. However, Pearson then sold these products to Campus Book Company, Inc. at substantially higher  prices than those sold to Defendant Follett (approximately $95-$125 per product when, upon information and belief, the Defendant Retailer was charged approximately $45-$85 for the Inclusive Access per student) around the same time. Also, Pearson imposed onerous and unreasonable additional terms, such as requiring Campus Book Company, Inc. to send students to Defendant Follett's retail location to "confirm" the product purchased. Due to these discriminatory prices and terms, Campus Book Company, Inc. was effectively unable to compete with Defendant Follett for sales to students and was forced to close its doors in October 2019.

86.    Similarly, at Eastern Kentucky University, the Publishers offer a supplement print product for Inclusive Access courses for instances where the student chooses to buy a print book to go along with their auto-billed Inclusive Access course materials. The supplement print product is available for purchase by Non-Defendant Retailer, CBSKY, Inc. However, the Publishers charge

CBSKY, Inc. a significantly higher price for the workable substitute material as shown in the following examples:

| Class | Number | Book Title | Defendant Retailer *List Price (New)* of Book to Student | *Cost* to Retailer for Book |
|-------|--------|------------|---------------------------------------------|------------------|
| ACC | 201 | Horngren's Financial Accounting Loose-leaf | $57.15 | $119.99 |
| ACC | 202 | Managerial Accounting Loose-leaf | $57.15 | $164.99 |
| ACC | 327, 527, 727 | Horngren's Cost Accounting | $57.15 | $164.99 |
| ART | 200 | World of Art | $21.45 | $122.66 |
| BIO | 101 | Biology: Today + Tomorrow | $46.65 | $101.25 |
| MATH | 105 | Using + Understanding Math Loose-leaf | $57.15 | $109.99 |
| MATH | 112A | College Algebra in Context | $57.15 | $119.99 |
| PHY | 101 | Conceptual Physics Loose-leaf | $57.15 | $119.99 |
| STA | 215 | Statistics: Art + Science of Learning | $57.15 | $114.99 |

### 3.    Increased Prices for Course Materials.

87.    Over the years, the cost of non-course material books has decreased; however the costs of higher education course materials, including electronic course materials, have risen significantly over the last decade.[7] According to a recent study, 90% of faculty at Universities reported that textbook affordability is a concern for their institution.[8] When these faculty were asked to describe the greatest drivers of high course material prices, they cited monopoly control of the textbook publishing industry as a factor. While competition from Non-Defendant Retailers, online purchases, and the secondary market have all served as a check on course materials prices,

---

[7] The Bureau of Labor Statistics reports that textbook costs increased 88% between 2006 and 2016.
[8] *See* FlatWorld Textbook Affordability Study (2019).

Defendants' anticompetitive schemes have destroyed competition in the Inclusive Access Market in order to (1) restore Publishers to a position wherein they maintain a captive student customer base that must always purchase new materials produced and sold by the Publishers; and (2) situate the Retailer Defendants in a position with a captive student customer base that has no other retail choice. Both of these goals serve the ultimate end-goal of limiting supply in the market and raising the prices for course materials for student consumers.

### E.    No Legitimate, Pro-Competitive Justifications.

88.    There are no legitimate pro-competitive efficiencies that justify the Defendants' conduct or that outweigh the substantial anticompetitive effects of that conduct. Contrary to Defendants' representations, Inclusive Access does not represent any innovation, technological advancement, or cost savings to students. The "new" angle is a limitation on access, which is not procompetitive and results in fewer choices and increased prices for student-consumers. The access limitation actually diminishes the student's experience and purchasing options. Student-consumers now have only digital materials available in one specific format and only for a short window of time, with no competitive alternatives or opportunities to save on price. The access limitation also subtracts from competition in the marketplace, as other retailers have no ability to obtain or sell the Electronic Course Materials.

### 1.    Affordability.

89.    Affordability does not support Inclusive Access. The Publishers promote Inclusive Access to Universities by claiming costs are lower in order to convince the Universities to adopt their product. For example, Defendant Pearson has used the pretext that, with Inclusive Access, "all students are paying a lower and equitable price." Likewise, Defendant McGraw-Hill claims that Inclusive Access provides the "lower-cost option for individual courses, with prices of up to

70% off the cost of traditional bound textbooks." These statements are pretextual and are used by Defendants to further their anticompetitive schemes.

90.    As an example, a comparison of textbook course fees at Volunteer State Community College reveals that the lowest cost for course materials was offered by the Independent Collegiate Retailer and that the cost of Inclusive Access was significantly higher (often double or triple the cost):

| Volunteer State Community College | Business Law (Custom) for BUSN 2370 | Network + Guide to Networks (Custom) for CITC 1302 | Conceptual Physical Science (Custom) for PSCI 1030 |
|---|---|---|---|
| Inclusive Access | $79.70 | $70.35 | $87.50 |
| Amazon | $29.49 | $24.86 | $29.97 |
| Chegg | $29.49 | $23.99 | $30.99 |
| Independent Retailer | $29.99 | $29.99 | $29.99 |

91.    To the extent that Inclusive Access appears to be a better deal in any scenario, it is as the result of Publishers' concerted efforts to create that impression. The Publishers have complete control over pricing for both the Inclusive Access and other course materials. When the Publishers have compared prices to show Universities, they use their own prices as the baseline or fail to provide the true and complete market pricing. For example, in materials provided by a Publisher to a University the school reported the following:

| Class | Number | Book Title | Inclusive Access Pricing | New Book Pricing | New Book with Code Pricing | Used Book Pricing | Used Rental Pricing | Access Code Pricing | Inclusive Access Loose Leaf |
|---|---|---|---|---|---|---|---|---|---|
| BIOL | 11700 | Biology in Focus | $113.14 | $161.00 | $187.00 | $120.75 | $80.50 | $136.00 | *Included in Fee* |

92.     The Publisher did not report the price at certain independent retailers or the Amazon price. Amazon recently listed the textbook for rental at $34.96, used at $49.97, and in paperback new at $59.97. Certain Non-Defendant Retailers had the text available for rental at the market price—$29.95. Such "cases studies" can and do misrepresent the price and cost savings. Interestingly, these "case studies" do not provide the ISBN for the University to independently confirm the price of the course materials. Electronic Course Materials are not a better deal for students now and the problem will only worsen due to the upward price effects that will result from the elimination of the competitive and secondary markets for course materials.

93.     As revealed by a communication from one of the Publishers, the driver and purpose of Inclusive Access was never to reduce costs or to provide any benefits to students. The sole driver and purpose was to eliminate competition and increase prices and revenues. For example, in February 2015, a Senior Consultant for Defendant Cengage communicated about a "course fee model" and that:

> **"The goal is to cut out online student shopping (aka Amazon) and guarantee 100% sell-through."**

94.     In a recent interview after the announcement of the proposed McGraw-Hill and Cengage merger, Cengage CEO, Michael Hansen, stated that he agreed that as the Publishers capture additional volume through Inclusive Access they "**are able to rid [themselves] of the used bookstore market**."[9] A recent study confirmed that if the Publishers can destroy the secondary market, they may enjoy profits 42.6% higher than under current conditions.[10]

---

[9] *See* CNBC Interview of Michael E. Hansen, CEO of Defendant Cengage, and Nana Banerjee, President of Defendant McGraw-Hill (May 1, 2019).

[10] *See* Matt Schmitt and Tongtong Shi of Analysis Group, *Working Paper*, UCLA Anderson (2019).

2.    <u>Consumer Preference.</u>

95.    Contrary to Defendants' representations, consumer preference does not support a move to only Inclusive Access. Studies and other evidence demonstrate that students prefer a physical book as opposed to digital materials.[11] Product features and quality also do not support Inclusive Access. Industry opinion is that digital subscriptions offer inferior quality and inferior variety to other course materials. Examples of these inferiorities include requiring that all students access materials in the same way at the same price; applying expiration dates to access that prevent materials from being retained for future reference, shared with others, or resold; and quality that depends substantially on access to technology and internet connections. Indeed, thousands of students at the University of North Texas signed a petition calling for the school to end Inclusive Access.

3.    <u>Learning Outcomes.</u>

96.    Learning outcomes also do not support Inclusive Access. Studies and other evidence have shown that physical books are more effective for education than digital materials.[12] So-called "first day readiness" also is not enhanced by Inclusive Access. With prior course materials, over 80% of students already had all their class materials before the first or second day

---

[11] *See* March 1, 2018 Study at University of Central Arkansas; *see also* Naomi S. Baron, *Word Onscreen: The Fate of Reading in a Digital World*; *see also* Barnes & Noble Q2 2020 Earnings Call for the period ending Sept. 30, 2019 (Dec. 4, 2019) (wherein CEO Mike Huseby stated, "While digital coursework delivery is increasing, evidence persists that there is still a strong appetite to learn using the physical book. Our annual student pulse survey received response from more than 100,000 students. 96% of those students told us that they find print textbooks to be a helpful resource."); *see also* Letter from the Scholarly Publishing and Academic Resources Coalition ("SPARC"), to Honorable Makan Delrahim, Assistant Attorney General, United States Department of Justice Antitrust Division (Aug. 14, 2019) (concluding that "[a]bout half of students prefer some kind of print material over exclusively digital" and finding that "digital format may not, in fact, be better for students").

[12] *See* 2017 Study by Patricia Alexander, literacy scholar at the University of Maryland, in *Review of Educational Research* (determining that if a person is reading something more than 500 words, that person's comprehension will likely take a hit if the person is using a digital device).

of class. With Inclusive Access, technical orientation and other technical issues actually require class time to explain or address, which does not result in first-day readiness and decreases class time spent on substantive matters. Further, studies suggest that Inclusive Access does not improve student learning or grades.

**F.    Continuing Violations and Fraudulent Concealment.**

97.    As detailed above, the Defendants have engaged in an ongoing conspiracy to restrain trade, including by eliminating competition, controlling the market, monopolizing the market, raising pricing, and eliminating substitute products through repeated overt acts in furtherance of such conspiracy. Each sale of Inclusive Access by the Publishers and/or Retailer Defendants is an act in furtherance of the conspiracy. Defendants' ongoing anticompetitive conduct has caused and continues to cause harm to members of the Plaintiff Class including through payment of supra-competitive prices for course materials. Each of the Exclusive Dealing Agreements executed between 2016 and the present is an overt act that advances the illegal conspiracy and results in injury to the Plaintiff Class.

98.    The Defendants' continued communications and advancement of the conspiracy, as evidenced by the continued operations of EPEG, continued participation of NACs, and continued communications in furtherance of the conspiracy are overt acts in furtherance of the ongoing conspiracy.

99.    The Defendants' concerted actions were self-concealing and the Defendants took affirmative acts to conceal and disguise their illegal conspiracy. The Defendants engaged in an active misinformation campaign, designed to trick students, Universities, and competitors into believing that Inclusive Access was the result of consumer demand and technological advancements instead of Defendants' conspiracy. The Publishers further concealed their conspiracy by creating a system that disguised their involvement such that students were left to

believe that it was the Universities or the professors that mandated the use of Inclusive Access. Likewise, Defendants concealed their conspiracy by communicating to Non-Defendant Retailers that the exclusivity was a requirement of the Universities when in reality, the Defendants acted in concert to exclude retail competition.

100.    The anticompetitive actions of the Defendants have had the effect of restraining, suppressing, and eliminating competition in the sale of Electronic Course Materials and College Textbooks. The Defendants' conduct adversely affected competition and the Plaintiff Class by (i) reducing or eliminating the output of and access to Inclusive Access and course materials; (ii) eliminating or significantly reducing price competition for Inclusive Access and course materials; (iii) impeding or blocking the ability of actual or potential competitors to enter or expand sales in the relevant market; (iv) significantly raising barriers to entry for rivals; (v) reducing consumer choice among products and competing retailers; (vi) reducing quality and stifling innovation for course materials; and (vii) artificially inflating the price of course materials and Electronic Course Materials above competitive levels.

101.    Absent the Defendants' anticompetitive conduct and the substantial foreclosure and reduction of effective competition caused by such conduct, the Defendants would have faced additional competition.

### G.    The Industry is Conducive to the Conspiracy

102.    Characteristics of the post-secondary course materials market made it economically plausible and feasible for the alleged conspiracy to occur.

#### 1.    Market Entry Barriers

103.    The market for post-secondary course materials has several barriers to market entry that facilitate Defendants' conspiracy, making it feasible, and enhancing their market power.

104.    Intellectual property law forms the first barrier. Publishers consistently copyright their existing Electronic Course Materials and related material, so that no other publisher can reprint and sell existing published material. In addition, separate copyrights protect various photographs and illustrations within each book.

105.    Because of copyright law, and to have a marketable product, a new publisher would need to develop new textbooks, requiring substantial costs before any revenue is realized. Such costs include staff to acquire and develop content, licenses and permissions for illustrations and photographs, author advances in some cases, editing staff, typesetting, printing advance sample copies, and in the case of printed texts, printing enough copies for anticipated sales. There are also marketing and distribution costs, depending on the format and distribution channels, and royalties to authors. Development and pre-publication activity for some traditional textbooks have cost $1 million per title.

106.    A related entry barrier is economies of scale. The Publishers realize substantial economies of scale because they can spread development costs across numerous titles, and have existing titles in publication that they can rebrand as a new edition, sometimes with minor modifications. Competing with large companies blessed with economies of scale is a deterrent to new market entry, especially for a small start-up firm.

107.    Another entry barrier is access to Universities that select titles for their courses. A new entrant would need to know or learn the administrators and faculty, and obtain access to sell new materials to them. Then they would need to overcome the Publishers' decades-long relationships with those individuals.

108.    The Publishers have cemented their University relationships with exclusive arrangements with Universities and Retailer Defendants. Universities tend to use a book title for

several years, considering new titles only when the existing title is up for revision. This multi-year pace would slow any new market entry.

109.    The Universities' selection of course materials creates a barrier to a new entrant's selling directly to students. Defendants' Inclusive Access system is designed to, and tends to, raise this barrier further. Defendants' agreements with Universities and access systems make their products the default course materials for students, and make it difficult for students to opt out of that product and choose a substitute, as described in this complaint.

110.    These entry barriers enhance each other's effects. The more titles and authors the Publishers carry, the more they can sell to Universities. The more Universities with which Defendants have multi-year sales arrangements, the more new authors will prefer to publish with them. The Publishers' economies of scale further enhance these effects.

111.    Retailers also face substantial barriers to market entry. Copyrights limit available titles to those they can buy from existing Publishers, and as described, the industry features substantial barriers to new would-be publishers.

112.    A new retailer would face a similarly slow and difficult process selling to Universities. Many Universities use a Request For Proposal (RFP) system for substantial purchases. Many of them reportedly prefer retailers already operating numerous campus stores for that RFP process. Universities' tendency to consider new titles only when an existing title has become obsolete or is ready for a major revision further reduces a would-be new retailer's chance of selling to a University.

113.    Defendants' anticompetitive agreements enhance these retail entry barriers and add new barriers. For example Publishers' contracts with various Universities provide that they would only sell Course Materials through one of the Retailers Defendants, closing the door to new

entrants for the life of such agreements. As described in this complaint, Publishers have refused to sell Course Materials to retailers other than the Retailer Defendants, citing their actual or purported exclusive contracts. In other cases, the Publishers sold to other retailers only at higher prices than their prices for the Defendant Retailers, placing the other retailer in a less competitive position.

114.    Retailer Defendants operate 57% of campus bookstores. Universities frequently agree that Retailer Defendants shall be the Universities' exclusive retailer of recommended course materials. Defendants' lease agreements for the campus stores are frequently five years long, but can run up to 15 years, with a 90% renewal rate. These long and renewed terms substantially reduce a new would-be entrant's opportunities to make a new deal with a University.

115.    Retailer Defendants also make early guaranteed payments to Universities as part of these lease agreements. A substantial early guaranteed payment to the University would increase a new entrant's business risk, complicating its banking relationships and operating as a deterrent to starting up in this market.

116.    All of these entry barriers have deterred new entry into this market. The lack of new successful entrants further imputes Defendants' market power, facilitates their conspiracy, and renders their conspiracy more plausible and feasible.

### 2. Opportunities to Meet & Conspire

117.    Defendants had numerous opportunities to meet and conspire. The Publishers communicated with one another and attended meetings with one another regarding Inclusive Access (and related agreements and exclusionary activities) in at least the following instances: (1) conducting joint pilot programs for Electronic Course Materials at Universities; (2) coordinating efforts related to U.S. Department of Education rulemaking that could affect the delivery and price of Electronic Course Materials; and (3) meetings and communications regarding the proposed merger of Defendants Cengage and McGraw-Hill.

118.    Defendants enacted their scheme through the use of trade associations, including EPEG and NACS. As previously explained, the Publishers formed EPEG to collectively develop the EPEG Guidelines, which had the stated goal of eliminating counterfeit textbooks in the marketplace. However, the EPEG Guidelines have developed to control who can buy and sell course materials. The Publishers have jointly and coercively used the EPEG Guidelines to reduce supply and access, limit consumer choice, and raise prices of course materials. The EPEG Guidelines and their website's "white list" limit from whom Non-Defendant Retailers can buy books, with the purpose and effect of hindering the secondary market and reducing competition at the retail level. The Publishers collectively use the EPEG Guidelines to constrain retailers' use of Amazon and similar online platforms to purchase used books.

119.    The Defendants also used the National Association of Collegiate Stores ("NACS"), a professional trade association of retail outlets, including Retailer Defendants and Non-Defendant Retailers, to effectuate the Inclusive Access conspiracy. The Publishers are also members of NACS and attend NACS events, including panels for which the Publishers coordinate and present together. In September 2018, NACS announced a change in its bylaws to remove from its membership bookstores that are not the institutions' or student/faculty owned (i.e. not "on campus") bookstores. The changes were approved and implemented on April 1, 2019.

120.    In May 2019, Cengage and McGraw-Hill formally announced their planned merger. Accordingly, they have met to discuss the merger since even prior to 2019. These merger discussions have given them a further opportunity to exchange commercially sensitive and confidential information, and to discuss their "Inclusive Access" scheme.

121.    Through their meetings, the Publishers arranged and agreed upon a system by which they would collectively develop and convert the market to exclusively Inclusive Access and restrict access to Electronic Course Materials and other course materials.

3.    <u>A History of Anticompetitive Conduct and Recent Investigation.</u>

122.    The book publishing industry has a legacy of collusive and anticompetitive conduct.

123.    The proposed merger between competitors Cengage and McGraw-Hill sparked an investigation of those companies. On July 1, 2019, the Department of Justice sent a second request for information to the companies, signaling further government investigation of that arrangement.

124.    Since then, on March 10, 2020, U.S. Representatives David Cicilline and Jan Shakowski wrote to the Department of Justice, requesting that it "closely scrutinize" the proposed merger. The letter pointed out the industry's "excessive level of consolidation." The letter also expressed concern that the "'inclusive access' model" may remove price-shopping and prevent textbook resales, "destroying the cost-lowering effect of the secondary textbook market."

125.    More recently, on April 24, 2020, six U.S. Senators wrote to the Department of Justice, sharing "serious concerns regarding the proposed merger." The letter points out the "highly consolidated nature of the textbook industry," the problem of "inclusive access," and "strong incentives to collude rather than compete" if the merger was completed.

126.    United Kingdom's Competition & Markets Authority has also investigated the Cengage and McGraw-Hill merger. On March 20, 2020, that agency announced it had referred the merger for a Phase 2 investigation. On April 1, 2020, the agency announced a three week delay in its investigation "as the Parties were considering their next steps," including "whether to abandon the arrangements which are the subject of the reference." The agency said it "reasonably believes that the arrangements in question might be abandoned." Accordingly, it granted the delay. The

companies' spokesperson said the request allowed them to focus on their "ongoing" discussions with the U.S. Department of Justice.

127.    On May 4, 2020, McGraw-Hill and Cengage announced they were abandoning the merger. Cengage cited prolonged regulatory review as well as inability to agree with the Department of Justice on a package of divestitures.

128.    In addition, in the past several years, the publishing industry and various publishing companies have been the subject of both criminal and civil antitrust litigation regarding the price-fixing of electronic books. *See, e.g., In re Electronic Books Antitrust Litigation*, 1:11-md-02293-DLC (S.D.N.Y.) and *United States v. Apple Inc.,* 1:12-cv-02826 (S.D.N.Y.), (collectively, "The E-Books Litigation"). The E-Books Litigation alleged that five publisher defendants, Hachette Book Group, Inc., HarperCollins Publishers, Macmillan Publishers, Penguin Group, Inc., and Simon & Schuster, Inc. conspired with each other and with Apple Inc. to increase e-book prices and stabilize the industry.

129.    The E-Books Litigation unearthed evidence of repeated anticompetitive communications, meetings, and coordinated pricing decisions among publishers as well as between publishers and Apple Inc. The cases resolved with the publisher defendants settling and Apple Inc. losing at trial.

## VI.    RELEVANT MARKET

130.    Plaintiff alleges that Defendants' conduct was *per se* illegal:  the Publishers and the Retailer Defendants (1) colluded to establish and operate the Inclusive Access system in order to restrict the supply of textbooks and monopolize the market for textbooks so that they could raise prices, and (2) have effectively established a group boycott to prevent Electronic Course Materials from being sold through any other sources.

131.    However, to the extent that Plaintiff's attempted monopolization, or hypothetically, her conspiracy claims, must proceed under the rule of reason or otherwise require a defined relevant market, Plaintiff alternatively alleges as follows.

132.    The relevant product market for these antitrust claims is the market for Inclusive Access textbooks[13] (the "Inclusive Access Market"), including both Defendants' Electronic Course Materials and textbooks from sources other than Defendants.

133.    Defendants' Inclusive Access conspiracy seeks to use Inclusive Access to eliminate competition from new textbooks, used textbooks, and other electronic versions of textbooks, and from other online and physical textbook sellers.

134.    The Inclusive Access Market is a product market increasingly consisting mostly or only of Electronic Course Materials. To the extent Defendants' exclusionary conspiracy has succeeded, there are progressively fewer substitutes for Electronic Course Materials. The availability of new or used textbooks progressively constrains the price of Electronic Course Materials less over time, because Defendants seek to forbid students to use those textbooks in place of the Electronic Course Materials.

135.    Students can only purchase Electronic Course Materials from Defendants or their co-conspirators, including official on-campus retailers, whether run by the Retailer Defendants or by a University itself. Electronic Course Materials are generally not available from any other source, or in the rare cases where they are available, are at greater expense. Therefore, the isolated availability of College Textbooks from other sources does not materially constrain their price from official on-campus retailers.

---

[13] "College Textbooks" were previously defined as post-secondary level textbooks in any format and from any source, for which one of the Publishers offers an Inclusive Access version.

136.    At all relevant times, the Publishers had substantial market power in the Inclusive Access Market. On information and belief, the Publishers' market share exceeds 90% in the Inclusive Access Market.

137.    The Publishers had the power to maintain the price of Electronic Course Materials at supracompetitive levels, and to do so without losing substantial sales.

138.    The relevant geographic market is the United States.

139.    At all relevant times, the Retailer Defendants had substantial market power in the Inclusive Access Market at all Universities in which they operate official on-campus bookstores that have Inclusive Access programs. The Retailer Defendants had the power to maintain the price of Electronic Course Materials in those campuses at supra-competitive levels, and to do so profitably without losing substantial sales.

140.    The Retailer Defendants operate approximately 57% of the official campus bookstores. They serve nearly two-thirds of the nations' college and graduate students, and therefore have a very high market share in the overall Inclusive Access Market.

141.    The Inclusive Access Market is susceptible to collusion due to its small number of dominant publishers, the monopoly position of on-campus bookstores, the now-captive market of students who need the Electronic Course Materials to pass their classes, and high barriers to entry due to Publishers' and Retailer Defendants' longstanding relationships with textbook authors, professors assigning textbooks, and Universities.

142.    If the Defendants' actions are not enjoined, Defendants' Inclusive Access Market is likely to take over progressively more University textbook and course materials sales, resulting in higher prices and reduced choice for more students on more campuses and in more of their courses.

## VII.    CLASS ACTION ALLEGATIONS

143.    Plaintiff brings this action on behalf of herself as an end user, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3), seeking damages and injunctive relief pursuant to federal antitrust law for the following class:

> **All persons and entities who purchased Electronic Course Materials directly from a Publisher, a Retailer Defendant, or their co-conspirators for personal use in the United States during the Class Period.**

144.    Specifically excluded from this Class are Defendants and their parents, subsidiaries and affiliates; any entity in which any Defendant has a controlling interest; the officers, directors, or employees of any Defendant; and any legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of their immediate families and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

145.    The Class Period is from July 1, 2016, to the present or the end of the anticompetitive effects of Defendants' actions.

146.    Plaintiff is a direct purchaser from one or more of the Defendants.

147.    Further, because the Retailer Defendants have conspired with the Publishers, *Illinois Brick's* co-conspirator exception allows federal antitrust claims against the Publishers. The Retailer Defendants' joint and several liability with the Publishers, without a right of contribution or indemnity, makes them inappropriate plaintiffs to sue the Publishers for these violations. Accordingly, Plaintiff's purchases from the Publishers and Retailer Defendants make Plaintiff the first non-conspirator purchaser from the conspiracy, and the most suitable plaintiff for these claims.

148.    **Class Identity**:  The above-defined Class is readily identifiable and ascertainable and a Class for which identifying records should exist.

149.    **Numerosity**:  Plaintiff does not know the exact number of class members because such information is presently in the exclusive control of Defendants, their co-conspirators, and other entities. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members geographically disbursed throughout the United States, such that joinder of all class members is impracticable.

150.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Electronic Course Materials directly from one or more of the Defendants for personal use. Therefore, Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

151.    **Common Questions Predominate**:  The Class has questions of law and fact common to the Class, including, but not limited to:

    a.  Whether the Publishers and Retailer Defendants agreed to promote, implement and enforce the Inclusive Access system;

    b.  Whether the Publishers agreed among themselves to fix, raise, stabilize or maintain the price of textbooks and course materials based on the Inclusive Access system;

    c.  Whether the Publishers conspired to unreasonably restrain trade by artificially limiting capacity and reducing supply;

    d.  Whether the Publishers concertedly refused to deal with independent retailers who sought to sell College Textbooks or Electronic Course Materials;

e.  Whether the Retailer Defendants conspired to fix, raise, stabilize, or maintain the price of textbooks and course materials under the Inclusive Access system;

f.  Whether the Retailer Defendants conspired to unreasonably restrain trade by artificially limiting capacity and reducing supply;

g.  Whether Defendants engaged in an overarching conspiracy among themselves to fix, raise, maintain, or stabilize the price of textbooks and course materials under the Inclusive Access system, or to unreasonably restrain trade by artificially limiting capacity and reducing supply;

h.  Whether Defendants engaged in exclusive dealings and other restrictive, exclusionary, unfair, and anticompetitive conduct;

i.  The identity of the conspiracy's participants;

j.  The duration and extent of the conspiracy alleged in this complaint and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

k.  Whether the alleged conspiracies violated federal antitrust laws;

l.  Whether the Defendants' conduct caused injury to the business or property of the Plaintiff and other class members;

m.  The effect of the alleged conspiracies on capacity, supply, and access in the market for Electronic Course Materials at Universities;

n.  The appropriate class-wide measure of damages; and

o.  Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

152.    These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

153.    **Adequacy**:  Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interest is aligned with, and not antagonistic to, those of the other members of the Class who directly purchased Electronic Course Materials from the Defendants. Plaintiff has retained counsel competent and experienced in prosecuting class actions and antitrust litigation to represent them and the Class.

154.    **Superiority**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law alleged in this complaint. Individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties than individual litigation and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

155.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

156.    Plaintiff brings this action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, directly purchased Electronic Course Materials from a Publisher or Retailer Defendant for personal use during the Class Period.

157.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.    TRADE AND COMMERCE

158.    Defendants produced and sold Electronic Course Materials in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

159.    Barnes & Noble operates campus college bookstores in 43 states, and on information and belief sells Electronic Course Materials to students in all of those states.

160.    Follett operates campus college bookstores in 48 states, and on information and belief sells Electronic Course Materials to students in all of those states.

161.    Cengage, McGraw-Hill, and Pearson sell textbooks and course materials through Inclusive Access to students in all 50 states.

162.    Defendants' business activities and agreements substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

## IX.    ANTITRUST INJURY

163.    At Universities that use Inclusive Access and school-run campus bookstores, the Publishers' agreements and actions have forced class members to purchase Electronic Course

Materials from Defendants, forcing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary market. Class members dealt directly and had privity with the Publishers because they accessed software through the Publishers.

164.    At Universities that use Inclusive Access and campus bookstores operated by the Retailer Defendants, the Publishers' and Retailer Defendants' agreements and actions have forced Plaintiff and Class Members to purchase Electronic Course Materials from only Defendants, forcing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary market. Class members dealt directly and had privity with the Publishers because they accessed software through the Publishers.

165.    Defendants' anticompetitive conduct had the following effects, among others.

    a.  Price competition has been restrained with respect to Inclusive Access textbooks;

    b.  The price of Electronic Course Materials has been fixed, raised, stabilized, or maintained at artificially inflated levels; and

    c.  Purchasers of Inclusive Access textbooks have been deprived of free and open competition; and,

    d.  Purchasers of Electronic Course Materials have paid supracompetitive prices.

166.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, or maintain the price of Electronic Course Materials, and as a direct and foreseeable result, Plaintiff and the class members paid supra-competitive prices for Electronic Course Materials during the Class Period.

167.     By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their business or property, having paid higher prices for Inclusive Access textbooks and especially for Electronic Course Materials, than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

168.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X.     CLAIMS FOR RELIEF

169.     Plaintiff asserts the following claims for damages and injunctive relief. The claims are based on Defendants' federal antitrust violations. Plaintiff asserts each claim against all Defendants.

**COUNT 1**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**
**CONSPIRACY RESTRAINING TRADE**

170.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

171.     Beginning at a time currently unknown to Plaintiff, but at least as early as July 1, 2016, and continuing through the present, the exact dates being unknown to Plaintiff, the Publishers and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and maintain the prices in the Inclusive Access Market, to end price competition, and to limit interbrand competition in the United States, including other publishers, retailers, and used book sellers, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

172.     The Publishers colluded to restrain trade in textbooks through the Inclusive Access conspiracy described herein, including through: (1) working with the Retailer Defendants and University-run campus bookstores to impose Inclusive Access; (2) arranging to have Universities

mandate students' purchase of Electronic Course Materials for their courses; (3) arranging to have Universities prohibit or discourage students' using substitutes for Electronic Course Materials for their courses; (4) refusing to sell Inclusive Access textbooks to retailers other than official campus bookstores run by the Universities or the Retailer Defendants, including by imposing pretextual anti-counterfeiting standards, all intended to eliminate competition and raise prices by establishing a captive market for textbooks through Inclusive Access.

173.    The Retailer Defendants colluded to restrain trade in textbooks at the Universities on which they operate official campus bookstores through the Inclusive Access conspiracy described herein, including through: (1) working with the Publishers and Universities to impose Inclusive Access; (2) arranging to have Universities mandate students' purchasing Electronic Course Materials; and (3) arranging to have Universities prohibit the use of Inclusive Access textbooks other than Electronic Course Materials by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

174.    Defendants implemented their combination and conspiracy by, among other methods, entering into agreements with one another to boycott and boycotting textbook sellers other than the Retailer Defendants, especially lower-cost retailers, who sought to sell College Textbooks to students. This aspect of the conspiracy was a *per se* unlawful group boycott, or in the alternative was an unlawful restraint under the rule of reason.

175.    Where, as here, Defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required. To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this action is the Inclusive Access Market, as previously

alleged. The anticompetitive acts at issue in this case directly affect the sale of Electronic Course Materials to consumers. The relevant geographic market is the United States.

176.    The Publishers possess market power in the Inclusive Access Market. The Publishers have successfully obtained control over sales of Electronic Course Materials sold to University students on an exclusive basis in many instances. They have imposed and sustained significant supracompetitive premiums over potential competing sources of such materials. They control a critical source of information for students who need such information to learn their course material, pass their course, and graduate from college.

177.    The Retailer Defendants possess market power in the market for Inclusive Access textbooks and especially as to Electronic Course Materials. The Retailer Defendants operate approximately 57% of official campus bookstores. They serve nearly two-thirds of the nation's college and graduate students, and therefore control a very high market share in the overall Inclusive Access Market. Especially for those schools where the Retailer Defendants control the campus bookstore, they control sales of Electronic Course Materials, and College Textbooks, on an exclusive basis in many instances. They have imposed and sustained significant supracompetitive premiums over potential competing sources of such materials. They control a critical source of information for students who need such information to learn their course material, pass their course, and graduate from college.

178.    The combination and conspiracy alleged herein has had the following effects, among others:

        a.   Price competition in the sale of Inclusive Access textbooks in the Inclusive Access Market has been restrained, suppressed, and/or eliminated in the United States;

b.  Output for the Inclusive Access Market has been restrained and suppressed in the United States; and,

c.  Prices for Electronic Course Materials in the Inclusive Access Market sold by the Defendants and all of their co-conspirators have been fixed, raised, stabilized and maintained at artificially high, non-competitive levels throughout the United States; and

d.  Those who purchased Electronic Course Materials directly from the Publishers or their co-conspirators, including the Retailer Defendants, for personal use, have been deprived of the benefit of free and open competition.

179.    Plaintiff and members of the Class are direct purchasers from Defendants.

180.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for Electronic Course Materials and Inclusive Access textbooks purchased directly from the Publishers or Retailer Defendants for their personal use than they would have paid in the absence of the combination and conspiracy. These injuries are antitrust injuries flowing directly from the unlawful conduct alleged herein and are of the kind the antitrust laws are intended to prevent.

181.    As a result of the Publishers' and Retailer Defendants' violations of Section 1 of the Sherman Act, Plaintiff and other members of the Class have sustained damages, in amounts to be determined at trial.

182.    This offense is likely to continue and recur unless injunctive relief is granted.

183.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT 2**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2),**
**ATTEMPTED MONOPOLIZATION**

184.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

185.    Beginning at a time currently unknown to Plaintiff, but at least as early as July 1, 2016, and continuing through the present, the Publishers have attempted to monopolize the Inclusive Access Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In the market for Inclusive Access textbooks at each individual University that uses Inclusive Access, the Publishers (and the Retailer Defendants at Universities where they run the official campus bookstore), engaged in predatory and anticompetitive conduct with the specific intent of monopolizing that market, and with a dangerous probability of monopolizing that market.

186.    The relevant product market for this claim is the Inclusive Access Market, as described in this complaint. The relevant geographic market for this claim is the United States.

187.    Defendants possess market power in the Inclusive Access Market. The Publishers (and the Retailer Defendants at Universities where they run the official campus bookstore) acquired their monopoly power willfully through the conspiracy described herein rather than through any technological advantages from, or consumer demand for, Inclusive Access.

188.    In the market for Inclusive Access textbooks at each individual University that uses Inclusive Access, at Universities at which a Defendant Retailer operates the official campus bookstore, the Publishers and Retailer Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market:  (1) arranging to have the University mandate that students purchase Electronic Course Materials and purchase them only from the Retailer Defendant who runs the official campus bookstore; (2) arranging to have the University prohibit the use of College Textbooks other than Electronic Course Materials by

students in Inclusive Access courses; and (3) the Publishers refusing to sell Electronic Course Materials to retailers other than the official campus bookstores operated by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

189.    In the market for Inclusive Access textbooks at each individual University that uses Inclusive Access and where the University operates the official campus bookstore, the Publishers engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market:  (1) arranging to have the University mandate that students purchase Electronic Course Materials and purchase them only from the official campus bookstore; (2) arranging to have the University prohibit the use of Inclusive Access textbooks other than Electronic Course Materials by students with Inclusive Access courses; and (3) refusing to sell Electronic Course Materials to retailers other than the official campus bookstore, including by imposing pretextual anti-counterfeiting standards.

190.    There is a dangerous probability that the Publishers' conduct will in fact monopolize the market for Inclusive Access textbooks at Universities that use Inclusive Access, and that the Retailer Defendants' conduct will in fact monopolize the market for Inclusive Access textbooks at Universities at which they operate the official campus bookstores, since through these policies they have excluded other possible competition from that market.

191.    These actions by the Publishers (and Retailer Defendants where applicable) are an attempted monopolization of the market for Inclusive Access textbooks at each such University, in violation of 15 U.S.C. § 2.

192.    The Defendants' anticompetitive conduct has diminished, and continues to diminish, competition in the above-referenced relevant product market pertinent to this claim, to the detriment of Plaintiff and other members of the Class.

193.    Plaintiff and members of the Class are direct purchasers from one or more of the Defendants.

194.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for Inclusive Access textbooks, especially Electronic Course Materials, purchased directly from the Publishers and Retailer Defendants than they would have paid in the absence of Defendants' anticompetitive conduct. These injuries are antitrust injuries flowing directly from the unlawful conduct alleged herein and are of the kind the antitrust laws intend to prevent.

195.    As a result of the Publishers' and Retailer Defendants' violations of Section 2 of the Sherman Act, Plaintiff and other members of the Class have sustained damages, in amounts to be determined at trial.

196.    The injuries sustained by Plaintiff and other members of the Class are not remediable solely by payment of monetary damages. Unless restrained, the Defendants will continue to engage in or resume such anticompetitive conduct.

197.    Accordingly, Plaintiff and the other members of the Class further request that a declaratory judgment be entered pursuant to Fed. R. Civ. P. 57, finding that the Publishers' conduct violates Section 2 of the Sherman Act. Plaintiff and the other members of the Class further request that the Court enjoin and restrain the Publishers' wrongful conduct pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT 3
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2), CONSPIRACY TO MONOPOLIZE

198.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

199.    Beginning at a time currently unknown to Plaintiff, but at least as early as July 1, 2016, and continuing through the present, the Publishers and Retailer Defendants have conspired to monopolize the Inclusive Access Market through their exclusionary anticompetitive conduct described in this complaint in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

200.    The Publishers colluded to restrain trade in textbooks through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for College Textbooks, by: (1) working with the Retailer Defendants and University-run bookstores to impose Inclusive Access; (2) arranging to have Universities mandate the purchase of Electronic Course Materials by students; (3) arranging to have Universities prohibit the use of Inclusive Access textbooks other than Electronic Course Materials by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official campus bookstores operated by the Retailer Defendants or the Universities, including by imposing pretextual counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

201.    The Retailer Defendants colluded to restrain trade in textbooks in the Universities at which they operate official campus bookstores through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access textbooks at those Universities, by (1) working with the Publishers and Universities to impose the Inclusive Access system on students; (2) arranging to have Universities mandate the purchase of Electronic Course Materials by students; and (3) arranging to have Universities prohibit the use of Inclusive Access textbooks other than Electronic Course Materials by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

202.    The Publishers and Retailer Defendants committed overt acts in furtherance of the conspiracy alleged herein, including entering into exclusivity agreements between Publishers, Retailer Defendants, and Universities, between Publishers and Retailer Defendants, between Publishers and Universities, and between Retailer Defendants and Universities.

203.    The relevant product market for this claim is the Inclusive Access Market, as described in this complaint. The relevant geographic market for this claim is the United States.

204.    The Publishers possess market power in the above-described product and geographic markets. Their substantial market power is not based on lawful market dominance or other lawful justification.

205.    These actions by the Publishers (and the Retailer Defendants where applicable) are a conspiracy to monopolize the Inclusive Access Market at each such University, in violation of 15 U.S.C. § 2.

206.    The Defendants' anticompetitive conduct has diminished, and continues to diminish, competition in the above-referenced relevant market pertinent to this claim, to the detriment of Plaintiff and other members of the Class.

207.    Plaintiff and members of the Class are direct purchasers from one or more of the Defendants.

208.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for Inclusive Access textbooks purchased directly from the Publishers and Retailer Defendants than they would have paid in a competitive market in the absence of the combination and conspiracy. These injuries are antitrust injuries flowing directly from the unlawful conduct alleged herein and are of the kind the antitrust laws are intended to prevent.

209.     As a result of the Defendants' violations of Section 2 of the Sherman Act, Plaintiff and other members of the Class have sustained damages, in amounts to be determined at trial.

210.     The injuries sustained by Plaintiff and other members of the Class are not remediable solely by payment of monetary damages. Unless restrained, the Publishers will continue to engage in or resume such anticompetitive conduct.

211.     Accordingly, Plaintiff and the other members of the Class further request that a declaratory judgment be entered pursuant to Fed. R. Civ. P. 57, finding that the Publishers' conduct violates Section 2 of the Sherman Act. Plaintiff and the other members of the Class further request that the Court enjoin and restrain the Publishers' wrongful conduct pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## XI.     REQUEST FOR RELIEF

212.     WHEREFORE, Plaintiff, on behalf of herself and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows.

213.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff and Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

214.     The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Sections 1 and 2 of the Sherman Act;

215.     Plaintiff and the Class recover damages, with joint and several judgments in favor of Plaintiff and the members of the Class entered against Defendants in an amount to be trebled to the extent the law permits;

216.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose of effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

217.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of the competitor's information or facilitates exclusion of competitors;

218.    Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, with such interest at the highest legal rate from and after the date of service of this Complaint;

219.    Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

220.    Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XII.    JURY TRIAL DEMANDED

221.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issue so triable.

Dated: June 15, 2020                            Respectfully submitted,

*/s/ William G. Caldes*
William G. Caldes
(Bar I.D. No. 00062-1995)
Eugene A. Spector
(*Pro Hac Vice forthcoming*)
Jeffrey L. Spector
(Bar I.D. No. 03375-2007)
Diana J. Zinser
(*Pro Hac Vice forthcoming*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19131
Phone: (215) 496-0300
Fax: (215) 496-6611
espector@srkattorneys.com
bcaldes@srkattorneys.com
jspector@srkattorneys.com
dzinser@srkattorneys.com

Heidi M. Silton
(*Pro Hac Vice forthcoming*)
Jessica N. Servais
(*Pro Hac Vice forthcoming*)
Craig S. Davis
(*Pro Hac Vice forthcoming*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F:  (612) 339-0981
hmsilton@locklaw.com
jnservais@locklaw.com
csdavis@locklaw.com